UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

RICK A. PFLIPSEN,                                           BKY 05-40999

        Debtor.

TERRI A. GEORGEN-RUNNING,

        Plaintiff,                                           ADV 05-4222

  -v.-

RICK A. PFLIPSEN,                                           MEMORANDUM OPINION
                                                            GRANTING MOTION FOR
        Defendant.                                        SUMMARY JUDGMENT

---

      At Minneapolis, Minnesota, February 10, 2006.

      The above entitled matter came on for hearing before the undersigned on Plaintiff's motion for summary judgment. Appearances were noted on the record. The court heard argument and has studied the record and determined that Plaintiff is entitled to summary judgment denying Rick A. Pflipsen a discharge under 11 U.S.C. §§ 727(a)(2) and (a)(4). There are no material issues of fact and summary judgment is appropriate as a matter of law.

      Defendant Rick A. Pflipsen ("Debtor") and Pamela Gibbs ("Pamela") married on November 27, 1993. They purchased a home where the family resides located at 1269 Benton Street, Anoka, Minnesota. Debtor owned a business, Corporate Presentations, Inc. (CPI), and for a time Pamela worked in the business. The business began to fail and CPI stopped paying its Minnesota state sales tax obligations. It also failed to pay over to the federal government the withheld income taxes for employees. The claims for such obligations were significant, the state claiming at least $64,000 in

unpaid sales taxes. On October 22, 2001, the IRS issued a notice of intent to levy on company assets. In November 2001, Debtor met with the IRS and the company attorney about finances and the attorney advised Debtor to obtain counsel because he had potential personal liability for the debts. The IRS requested personal financial statements from Debtor which he did not furnish. Pamela admitted in her deposition testimony by this time that she was worried about losing the family home, but especially losing the newly purchased family lake property.

Debtor and Pamela had purchased the lake property on January 15, 2001, on a contract for deed for $125,000. At the time the property had a garage-like structure with a loft area. They made an earnest money payment of $2,500 and a payment at closing of $17,500. The contract called for a payment of $5,000 on July 15, 2001, and semi-annual payments of $5,000 until January 15, 2005, at which time the balloon payment for the balance would come due. They made the first $5,000 payment and then in the fall of 2001 paid the contract using funds by obtaining a mortgage from the First National Bank of Cold Spring. While Debtor attempted to assert that much of the money that was used to pay for the purchase of the lake cabin came from an inheritance that Pamela received, Pamela herself denied that. At most, she said, she put no more than $4,000 of her non-marital property into the lake property. The rest came from money Debtor and Pamela borrowed on their home equity loan on the Anoka homestead or payments made from checking accounts held either in the name of the two of them jointly or Pamela separately. It is clear that the lake property is important to Debtor and to Pamela. There is now a large home on the property and Pamela and the children now live there. Debtor may also be living there.

On February 4, 2002, the Minnesota Department of Revenue issued an Order Assessing Personal Liability to Debtor for unpaid state sales taxes and withholding taxes. On March 1, 2002, Debtor signed a quit claim deed conveying and quitclaiming all his interest in the lake property to Pamela. On the same date Debtor signed a quit claim deed conveying all his interest in the Anoka homestead to Pamela. Both quit claim deeds were promptly recorded. No money exchanged hands. There is also some evidence that during this time, Debtor transferred boats and snowmobiles to Pamela, all of which were stored at the lake property.[1] In October 2002 a creditor, Ronald Berg, commenced an action in Stearns County District Court. He alleged that Debtor had defrauded him in the operations of the business and had taken money out of the company, in which they were co-owners, for Debtor's personal benefit, including Debtor's putting money into the development of the lake property. Berg sought in excess of $175,000 in damages. In October 2002 the state of Minnesota personally assessed Debtor liability for $64,000 in outstanding state tax liabilities.

In addition, in 1998 Debtor had received from his mother by quit claim deed a 1/3 remainder interest in certain real estate. He quitclaimed his interest in that real estate to Pamela on May 22, 2003. In July 2003 Debtor also ceased using two checking accounts; one a joint account with Pamela at the Riverview Community Bank and a second at the First National Bank of Elk River. These accounts were not closed, they simply went dormant. From this time forward, all the way through to July 2005, several months after he had filed his bankruptcy petition, Debtor deposited his earnings from his employment into a checking account Pamela kept in her own name at the Riverview Bank. She then

---

[1] On April 10, 2002, Pamela apparently commenced a dissolution proceeding but nothing happened in this proceeding until much later. See footnote 2.

used the account to pay family expenses. Pamela also kept a savings account in her own name at the Riverview Bank.

On March 8, 2004, judgment was entered in the Berg litigation against Debtor in the sum of $282,705.01. Berg commenced post-judgment actions to collect. Debtor was apparently not cooperative since, in September 14, 2004, the state court in the Berg litigation ordered Debtor to comply with post-judgment discovery requests and further enjoined him from transferring any of his property. On November 2, 2004, Berg commenced a separate action against both Pamela and Debtor alleging that they had engaged in fraudulent conveyances with respect to the lake property and other assets.

Contemporaneously, Pamela served Debtor with a Petition for Dissolution of Marriage on October 27, 2004, and filed it on November 1, 2004. On January 10, 2005, Pamela's motion for temporary relief was heard in state district court. At the hearing, Debtor advised the family court that he agreed to the temporary relief sought by Pamela. An Order for Temporary Relief was entered on January 26, 2005. The parties agreed that Debtor would pay as temporary support and maintenance to Pamela the sum of $3,500 per month commencing February 1, 2005. He also agreed to pay her $2,462.70 in child support payments commencing on the same date. These were based on representations and agreements between the parties that Debtor's net income from current earnings was $8,209 per month while Pamela's was only $1,823 per month. Debtor was not represented in this temporary support and maintenance proceeding, but Pamela was, and Debtor also agreed to pay her counsel fees of $3,000. Shortly thereafter, on February 9, 2005, the parties signed and filed with the court a marital termination agreement. In that agreement the parties listed their assets and liabilities and

4

their agreed upon distribution of the same. Pamela would receive the homestead in Anoka valued at $425,000 (with a mortgage of $355,000), the lake property valued at $230,000, her own 401(k) worth $45,000, the pontoon boat valued at $5,000, the jet ski valued at $500, the fishing boat and motor valued at $500, the Riverview checking account valued at $2,000 and the savings account valued at $3,500. She would also keep the parties' Ford vehicle valued at $18,670 subject to a lien in the amount of $13,000. Debtor would keep only his 401(k) valued at $25,000, a few miscellaneous household electronics items, two snowmobiles valued at $1,000, and his life insurance valued at $1,600. He agreed to pay the mortgage on the homestead and she agreed to pay the amount due on the Ford. Debtor also agreed to pay credit card debt in the amount of $40,000 which was the declared amount of the couple's joint debt. He specifically acknowledged that Pamela had a non-marital interest in the lake property and waived any ownership interest in that property. She did agree that he could stay in the lake property paying rent of $500 per month until she sold the Anoka homestead or began construction on the home she expected to build there. Debtor agreed to pay $2,462.70 in monthly child support and the agreement contained the normal requirement that child support payments be withheld from his paychecks. The marital termination agreement acknowledged that both the Debtor and Pamela resided at the Anoka homestead. There was no mention of Debtor's or Pamela's interest in his mother's property and there was no mention of the September 14, 2004, state court order enjoining Debtor from transferring any property. The family court issued its Findings of Fact, Conclusions of Law and Order for Judgment adopting the parties' marital termination agreement on February 15, 2005. A few days later, as required in the marital termination agreement, Debtor again quitclaimed his interest in the Anoka homestead and the lake property to Pamela.

5

Six days later, on February 21, 2005, Debtor filed for Chapter 7 relief in this bankruptcy court. The petition lists Debtor's address as the lake property, 17504 Fisher Road, Cold Spring, Minnesota. Schedule B, Debtor's list of assets, indicates that he owns no checking account and discloses the 401(k) interest, his life insurance policy, his interest in CPI with no value, a potential tax refund of $5,000, the snowmobiles, and some jewelry, miscellaneous household tools and clothing, all of nominal value. Debtor claimed all these assets as exempt. He listed a debt to the state of Minnesota of $86,385.00 and also $797,103.70 in unsecured non-priority debt. Nearly $100,000 of that was in credit cards and he also sought to discharge numerous large judgments that apparently arose out of the operation of CPI, including the judgment to Berg. In his Statement of Financial Affairs, he stated that he had not transferred any assets within one year of the filing except the two quitclaim deeds he had just signed and filed in connection with the dissolution proceedings and stated that both properties had been transferred by quitclaim deed to Pamela in 2001. Debtor also stated that he was being garnished for child support since late 2004. He listed net income for 2005 of around $6,000, for 2004 of approximately $10,000 and for 2003 a loss of $31,016.

At the time he filed for relief, Debtor was not living at the lake property. He was residing with Pamela at the homestead in Anoka. He had the use, however, of both of those properties but he was not paying her rent as his schedules indicated. He was not and never had been garnished for child support. He had within a month prior to the filing of his bankruptcy petition transferred virtually everything he owned to Pamela by way of the Marital Termination Agreement and had assumed virtually all of the couple's debts. And, he had been for over two years depositing earnings in a checking account

6

which was not disclosed on his schedules. That account had approximately $4,500 in it at the date of filing of the petition.

When Debtor was asked by Plaintiff, his Chapter 7 trustee, the following question under oath at his meeting of creditors he gave the following answer:

Q. How do you pay your bills?

A. I basically go to the bank and cash my payroll check after garnishment and then I just get cashier's checks or cash.

That was not so. He did not cash his payroll checks; he deposited them in Pamela's account. He had never been garnished for child support and he did not pay his bills from cashed payroll checks; Pamela paid his bills out of the account. Indeed, in his affidavit filed in response to this motion, Debtor continued to misstate the truth. He said: "Concealed account. . . . Debtor did not know his ex-wife's bank account number or numbers, and he did not know that she kept a separate savings account. It would never have occurred to him to disclose someone else's bank account in his schedules. This omission, if it was an omission, was not material." Significantly, Debtor does not attest to not knowing about the checking account, only to not knowing the numbers of the account. More importantly, only two weeks earlier he had signed a marital termination agreement that listed her owning both a checking and a savings account and he specifically gave up his rights in both those accounts.

## CONCLUSIONS OF LAW

A. SUMMARY JUDGMENT STANDARDS

Summary judgment as set forth in Federal Rule of Procedure 56(c), applicable here by operation of Federal Rule of Bankruptcy Procedure 7056, is proper if after viewing the record in the

light most favorable to Debtor, the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 549-50 (8th Cir. 2005). An issue of material fact is genuine if it has a real basis in the record. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "A genuine issue of material fact is material if it 'might affect the outcome of the suit under the governing law.'" Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992) (*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Procedurally, the movant has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record which show a lack of genuine issue. Celotex Corp., 477 U.S. at 323. The moving party has the burden of showing that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The movant discharges its burden by asserting that the record does not contain a triable issue and identifying that part of the record which supports the moving party's assertion. City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, 838 F.2d 268, 273 (8th Cir. 1988).

When the moving party has carried its burden under Rule 56(c), the burden of production shifts to the non-moving party, and it must do more than simply show there is some metaphysical doubt as to the material facts. Matsushita, 475 U.S. at 586. The non-moving party must go beyond the pleadings and by its own affidavits, depositions, answers to interrogatories, and admissions on file, establish that there are specific and genuine issues of material fact that warrant a trial. Celotex, 477 U.S. at 325. The non-moving party must establish specific significant probative evidence supporting its case. Johnson v.

8

Enron Corp., 906 F.2d 1234, 1237 (8th Cir. 1990). If the evidence presented is merely colorable or is not significantly probative, the non-moving party has not carried its burden and the court must grant summary judgment to the moving party. *See* FED. R. CIV. P. 56(e).

B.  DISCUSSION

The plaintiff alleges two causes of action. One under § 727(a)(2) and one under § 727(a)(4) (2004).[2] The elements of a violation of 11 U.S.C. § 727 must be proven by a preponderance of the evidence to merit denial of discharge. See Barclays/American Bus. Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 394 (6th Cir. 1994), *cert denied*, 513 U.S. 1111 (1995). The burden of proof in a denial of discharge case is on the objecting party. Korte v. United States (In re Korte), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (*citing* FED. R. BANKR. P. 4005). The denial of discharge provisions of § 727 "are strictly construed in favor of the debtor." Fox v. Schmit (In re Schmit), 71 B.R. 587, 589-90 (Bankr. D. Minn. 1987). Importantly, however, § 727 was also included to prevent the debtor's abuse of the Bankruptcy Code. Id. at 590.

    1.    SECTION 727(a)(2)

To succeed on a section 727(a)(2) claim, the Trustee must prove by a preponderance of the evidence that:

(1)    the act complained of was done within one year prior to the date of petition filing;
(2)    the act was that of the debtor;
(3)    the act consisted of a transfer, removal, destruction or concealment of the debtor's property or property of the estate; and

---

[2]This case was filed prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

    (4)    the act was done with an intent to hinder, delay, or defraud either a creditor or an officer of the estate.

Kaler v. Craig (In re Craig), 195 B.R. 443, 448 (Bankr. D.N.D. 1996).

    The Trustee has shown by an extensive, undisputed evidentiary record that one year prior to filing, Debtor transferred via a marital termination agreement and by Judgment and Decree dissolving his marriage, his marital interest in a lake cabin valued at $230,000, his homestead valued at $430,000, various items of personal property including his interest in a motor vehicle, two boats, and whatever interest he possessed in the funds in the bank account of his former spouse, Pamela. Debtor failed to disclose the transfer of the entire amount of his wages into his wife's account, failed to disclose payments made from that account on his behalf, and in payments of debts for which he was still responsible, and failed to disclose both to the Trustee and to the state district court, the existence of his, at the very least, marital interest in his mother's homestead. Debtor's affidavit filed in opposition to the motion does not dispute any of the factual allegations contained in the Trustee's motion, at least not to a level that actually raises more than some metaphysical doubt as to the material facts. Matsushita, 475 U.S. at 586.

    Debtor's primary argument is that he lacks the requisite intent. As to intent, the Trustee:

> need not show fraudulent intent on the debtor's part to succeed on a § 727(a)(2)(A) claim, it must show the debtor acted with actual intent to hinder, delay, or defraud a creditor. Proving the requisite actual intent with direct evidence is difficult. Thus, such actual intent may be "inferred from the facts and circumstances of the debtor's conduct."

In re Korte, 262 B.R. at 472 (internal citations omitted). As in Korte, Debtor transferred almost all of his assets, yet retained the beneficial use of those asset during the course of his financial difficulties. His retention of such a beneficial use, coupled with his attempts to evade payment of his creditors, demonstrated the kind of actual intent § 727(a)(2)(A) requires. Id. at 473. *See generally*, In re Craig,

195 B.R. at 450 ("Courts have long been concerned over situations where . . . debtors shield their property from the reach of creditors by placing legal title in others--all the while retaining an equitable interest."); Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000) (finding that bankruptcy court correctly inferred requisite intent to hinder or defraud creditors where debtor concealed his beneficial interest in real property which was titled in his parents' names but on which he resided rent-free and had made several mortgage payments). Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1241 (9th Cir. 1997) ("Evidence was adduced below that allowed the court to infer that the debtor retained and concealed from her creditors a secret benefit in regard to the deed of trust"); Coggin v. Coggin (In re Coggin), 30 F.3d 1443, 1451 (11th Cir. 1994). Debtor hid his earnings in his wife's bank account, but retained the use of those funds. Although Debtor had no obligation to maintain a checking account for the benefit of his creditors, *see* In re Ratner, 132 B.R. 728, 733 (N.D. Ill. 1991), "§ 727(a)(2)(A) makes it clear that a debtor may not divest himself of property with the intent to hinder, delay or defraud his creditors and still receive a discharge." In re Kontrick, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd* 540 U.S. 443 (2004). In Kontrick, the court determined that the bankruptcy court had properly concluded that the circumstances surrounding the use of a spouse's checking account supplied sufficient circumstantial evidence to permit the conclusion that the debtor had attempted to evade payment to his creditors when the debtor admitted his use of his spouses account was to prevent his creditors access to his property. Id at 737. In this case, Debtor's failure to disclose the checking account, failure to disclose his use of the funds in this account to pay his personal bills, and his false testimony regarding how he obtained funds for his personal use is sufficient circumstantial evidence to conclude that he attempted to hinder, delay and defraud. In addition, he transferred his lake cabin to his

11

wife, but retained the use of the property even after his dissolution. He transferred his interest in his homestead, but continued to reside in the property. Under the facts of this case, and based upon the Trustee's undisputed evidentiary record, summary judgment is appropriate under this section.

2. SECTION 727(a)(4)

Under 11 U.S.C. § 727(a)(4)(A), Debtor is entitled to a discharge unless he "knowingly and fraudulently, in or in connection with the case made a false oath or account." For such a false oath or account to bar a discharge, the false statement must be "material." Palatine Nat'l Bank v. Olson (In re Olson), 916 F.2d 481, 484 (8th Cir. 1990). "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." 916 F.2d at 484. As § 727(a)(4)(A) makes clear, "[t]he Code requires nothing less than a full and complete disclosure of any and all apparent interests of any kind." Fokkena v. Tripp (In re Tripp), 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998) (*citing* In re Craig, 195 B.R. 443, 451 (Bankr. D.N.D. 1996)). Debtor's "petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000) (*citing* Mertz v. Rott, 955 F.2d 596, 598 (8th Cir. 1992)). A false oath bars discharge in bankruptcy if it is both material and made with an intent to defraud. *See* Korte, 262 B.R. at 474. "Intent can be established by circumstantial evidence, and statements made with reckless indifference to the truth are regarded as intentionally false." Id. (internal quotations and citations omitted). The materiality threshold is low; even a fairly modest asset is material because it need only "bear[] a relationship to the bankrupt's business transactions or estate, or concern[]

12

the discovery of assets, . . . or the existence and disposition of his property." *See* Mertz v. Rott, 955 F.2d at 598 (internal citations omitted); *see also* In re Bren, 122 Fed. Appx. 285 (8th Cir. 2005).

Four omissions in particular rise to the level of false oaths.

1) Debtor's disclosure of the incorrect address for his residence hid from the Trustee, and any other interested party, that he continued to reside in property to which he no longer claimed any interest. The incorrect disclosure comes in conjunction with the disclosed transfer of that property to his spouse in the divorce decree. The Trustee uses the address given by debtors to determine the extent of their interests in the property in which they reside. Therefore, disclosure of a debtor's residence concerns the discovery of assets and the existence and disposition of property of the estate or a debtor's property.

2) Debtor failed to disclose his interest in his wife's bank account. Although Debtor may be correct that he does not need to disclose an account held solely by his ex-spouse, he is obligated to disclose, on Schedule B, No. 33, "other personal property of any kind not already listed." Debtor failed to disclose his interest in the funds in his wife's checking account, and failed to determine the extent of that interest. It is unlikely that the entire balance of the checking account, exceeding $4,000, consisted only of the earnings of his then ex-spouse. In addition, in response to the Trustee's motion, he failed to adequately account for the funds in this account, an accounting that should have been immediately forthcoming after the meeting of creditors.

    3)        Debtor's failure to disclose the transfer of assets pursuant to his marital termination agreement. It was not sufficient that Debtor disclosed the divorce action in his statement of financial affairs, he was under an affirmative obligation to disclose all the assets transferred by the decree. All of these assets had value, some of them very significant.

    4)        Most recently Debtor failed to honestly answer the trustee's question at the meeting of creditor how he paid his bills. His response to this question was a blatant attempt to continue the deception.

All of these failures to disclose appear to be self motivated. *See* Ellsworth v. Bauder (In re Bauder), 333 B.R. 828, 832 (B.A.P. 8th Cir. 2005). The overwhelming probative evidence provided by the Trustee shows a pattern of transfer and conceal in his bankruptcy filing, and showed a lack of forthrightness in his statements under oath. Discharge should also be denied under § 727(a)(4).

Oh, but Debtor argues, you need to give me the chance to testify at a trial so that I can show you that I did not intend these actions and that all of them were innocent. Debtor bases this argument on an Affidavit which is filled with continued misstatements, totally unbelievable assertions and explanations that do little more than show that Debtor wants more time so that he can continue to evade judgment day. While summary judgment is not appropriate for resolving factual issues,[3] the chronology set forth above, in a factual recitation that Debtor does not do much to refute, can lead to only one conclusion. Debtor spent over four years trying to avoid burgeoning debt and protect his family and properties from

---

[3]"[T]he trial judge's function is not to weigh the evidence and determine the truth of the matter, but rather, the judge must determine whether there is a genuine issue for trial." Johnson v. Enron Corp., 906 F.2d at 1237.

14

creditors, including Berg, and he used every trick that debtors have used in the book: deeds of assets to relatives without consideration; secret bank accounts into which pay is deposited; deferring and delaying in post-judgment proceedings; and here, in fact, misstatements to the state family court and to this court. Debtor's explanation that he did all of this in the name of estate planning because he was likely to get a large amount of money into his estate if he died (from a policy which it appears he had borrowed fully on) is so outlandish as to be utterly ridiculous and deceptive.  Debtor is not entitled to waste the Trustee's or the court's time trying to explain this litany of lies, deception, and fraudulent activity.

ACCORDINGLY, IT IS HEREBY ORDERED THAT the Trustee's motion is granted.  Rick A. Pflipsen's discharge is denied pursuant to §§ 727(a)(2)(A) and (a)(4).

LET JUDGMENT BE ENTERED ACCORDINGLY.

/e/ Nancy C. Dreher

Nancy C. Dreher
United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 2/10/06
Lori A. Vosejpka, Clerk, By KK